**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ENTERTAINMENT SOFTWARE ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 09 C 4387 |
| CHICAGO TRANSIT AUTHORITY, | ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case presents the question whether Defendant Chicago Transit Authority ("CTA"), a governmental entity, may prohibit commercial advertisements for mature-content video games on its trains, buses and facilities without running afoul of the First Amendment. On January 1, 2009, the CTA implemented an ordinance prohibiting any advertisement which "markets or identifies" a video or computer game with a "Mature" ("M") or "Adults Only" ("AO") rating. The CTA has no similar restrictions on advertisements for films or televison shows with adult ratings or content, nor does the CTA have any restrictions on political speech or issue advocacy. Plaintiff Entertainment Software Association ("ESA"), an industry group of game makers and sellers, filed this facial challenge to the CTA ordinance under the First and Fourteenth Amendments to the United States Constitution. In August 2009, Plaintiff ESA filed a motion seeking a preliminary injunction to enjoin the CTA from enforcing the ordinance. For reasons explained herein, the court grants Plaintiff's motion for a preliminary injunction.

## BACKGROUND

### I.     The CTA's function and advertising system

The CTA is a municipal corporation created by Illinois statute. 70 ILCS 3605/1 *et seq.* It operates the second largest public transportation system in the United States, carrying roughly 1.7 million passengers on its trains and busses every weekday. (Ex. A to Def's Br, O'Keefe Decl. at

¶ 2.) A number of those passengers on any given day are children. According to Monica O'Keefe, Manager of Media Sales for the CTA, over 96 percent of Chicago's schools and public parks are within two blocks of a CTA bus stop or rail station, and the CTA experiences a regular influx of school children immediately before and after school hours. (*Id.* at ¶ 3.)

To supplement the revenue it generates from fares, the CTA sells advertising space in its stations and on the inside and outside of its buses and rail cars. (*Id.* at ¶ 4.) For much of its history, the CTA had no clear, consistently-enforced policy for accepting or rejecting the advertisements it displayed in these areas. *See Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Authority*, 767 F.2d 1225, 1229-30 (7th Cir. 1985). As a result, in 1985, the Seventh Circuit concluded that the CTA advertising system had become a designated public forum for expression. *Id.* at 1232. In *Planned Parenthood*, the CTA refused to display advertisements for family planning services based on its stated policy of rejecting "controversial" ads. Finding that the CTA's "controversial" standard was applied arbitrarily, the Court of Appeals held that the CTA was obligated to post the ads. Because the CTA had opened itself to a "wide variety of commercial, political-candidate, and public issue advertising," the court found that the CTA advertising system had become a public forum and, thus, was not free to refuse ads based on content. *Id.* at 1227.

## II.     The CTA's recent advertising guidelines

In 1991, ostensibly in an effort to limit the types of ads that the system was compelled to accept, the Chicago Transit Board, CTA's governing body, adopted a series of guidelines for advertisements to be submitted and displayed on CTA property. (Ordinance No. 91-169, Ex. A to O'Keefe Decl.)[1] The ordinance states, in part:

WHEREAS, The Chicago Transit Board has determined to create

---

[1]     The CTA's operating guidelines are called ordinances because the CTA is a municipal entity created pursuant to Illinois statute. As such, the CTA acts under the color of state law and its property constitutes public property, just like any other municipality. The CTA does notdispute that it is a state actor for purposes of constitutional application.

certain exceptions to the non-public forum status of CTA property and to permit certain forms of public service, commercial, and other advertising in or upon CTA buses, rapid transit cars, and vehicles and facilities . . .

1. All advertising must comply with all applicable laws and with all ordinances, rules, regulations, requirements, and specifications promulgated by the Chicago Transit Authority ("CTA").[2]
   . . .

3. All commercial advertising must be truthful. False, deceptive, or misleading commercial advertising is not permitted. . . . Commercial advertising that proposes transactions which would constitute unlawful discrimination or would be illegal for any other reason is not permitted.

4. Advertising that is legally obscene is not permitted. In addition, sexually explicit advertising depicting nudity (male or female genitals, pubic areas, or buttocks with less than fully opaque covering; female breasts with less than fully opaque covering or any part of the areolae or nipples; or the covered genitals in a discernibly turgid or otherwise recognizable state) or sexual intercourse or other sexual acts is not permitted.

5. Advertising that portrays graphic violence, such as through the depiction of human or animal bodies, body parts, or fetuses in states of mutilation, dismemberment, disfigurement or decomposition, is not permitted.

6. Advertising that is directed to inciting or producing imminent lawless action and is likely to incite or produce such action, including but not limited to unlawful action based on a person's race, color, sex, age, religion, disability, national origin, ancestry, sexual orientation, marital or parental status, military discharge status, or source of income, is not permitted.

7. If advertising contains a testimonial, then the sponsor shall provide to the CTA documentation that the person making the testimonial has authorized its use in advertising.

8. Advertising cannot encourage persons to refrain from using safety precautions normally used in transit-related activities, such as awaiting, boarding, riding upon, or debarking from transit vehicles.
   . . .

---

[2] The guidelines not listed here refer to size and specification requirements, use of CTA endorsements or graphics, and the CTA's disclaimer of liability arising out of any advertising. None of those guidelines are relevant to this motion.

3

> 12. The placement of non-public-service advertising shall take precedence over placement of public service advertising.[3]

(*Id.*)  The ordinance further instructs that advertisements "shall be accepted for posting" unless the Executive Director of the CTA notifies the advertiser within 15 days of submission of an ad that  the ad fails to meet one of these guidelines.  (Id. at § 4.)

In 1997, citing the fact that a number of CTA passengers were minors who could not legally purchase tobacco or alcohol, the CTA also enacted a total ban on advertisements for tobacco products and alcoholic beverages.  (Ordinance 97-144, Ex. A to O'Keefe Decl.)  Other than the guidelines and the alcohol and tobacco ban, the CTA had no other regulations restricting the advertising it displayed on its property prior to adopting the ordinance that is challenged in this case.

### III.    The CTA and mature video games

In April 2008, pursuant to an advertising contract with the game's maker, the CTA displayed advertisements on its property for the mature-rated video game *Grand Theft Auto IV.*  (Def. Ans. at ¶ 19, D.E. 34.)  The *Grand Theft Auto IV* game contains graphic violence and sexual content, but the advertisements that were displayed on the CTA system did not depict violence or sexual acts. (*Id.*)  Soon after the advertisements appeared, a local television station aired a report commenting on violent crime in the Chicago area and questioning the CTA's decision to carry ads for the violent

---

[3]    The CTA's preference for "non-public-service" advertising appears to be motivated by revenue concerns alone.  "Public service" advertisers may display their ads on the system for no fee.  The CTA charges them only the labor costs of installing and removing ads.  To qualify for free display, the CTA requires that a public service ad be placed by a tax-exempt 501(c)(3) organization and that the ad be non-commercial, non-partisan, and not designated to influence a specific piece of legislation.  These requirements apply only to ads seeking free display. Advertisers that pay the full commercial advertising rate may presumably display partisan, commercial, or overtly political messages of any kind.   Non-public service advertisers, as the ordinance uses the term, refers simply to those who pay the full commercial advertising rate, regardless of the content of their advertisements.  Advertisements for video games would, without exception, fall into the CTA's preferred category of non-public-service advertising.

game. (*Id.* at 20.)  Citing public complaints, the CTA ordered the complete removal of the advertisements shortly thereafter.  (*Id.*)  The maker of Grand Theft Auto IV sued the CTA in an unrelated breach of contract case, and the parties entered into an undisclosed settlement agreement in September 2008.  (*Id.* at 21.)

In November 2008, the Chicago Transit Board approved and passed an ordinance (Ordinance 008-147), amending the CTA's advertising guidelines to prohibit "any advertisement on CTA vehicles and facilities which markets or identifies a video or computer game with an [Entertainment Software Rating Board] rating of 'Mature' or 'M' or 'Adults Only' or 'AO.'" (Ordinance 008-147, Ex. C to O'Keefe Decl.)  In its preamble, the ordinance refers to the prevalence of youth violence in the Chicago area and states, "[t]here is a demonstrable correlation between intensely violent video or computer games and violent or aggressive behavior . . . The Authority has a substantial interest in ensuring that its assets and resources are not used to advertise violent video or computer games which may foster or encourage violent aggressive behavior." (*Id.*)  The ordinance went into effect on January 1, 2009.

Plaintiff Entertainment Software Association is a trade association comprised of companies in the business of making, selling, and advertising video and computer games.  ESA counts Take Two Interactive Software, Inc., the maker of *Grand Theft Auto IV*, among its members.  ESA's stated purpose is to promote the business interests of its member companies, some of whom sell video games with violent or sexual content.  ESA established the Entertainment Software Rating Board ("ESRB") in 1994.  The ESRB, a self-regulatory body for the video game industry, assigns content ratings to video games and promulgates industry advertising guidelines.  (Vance Decl. at ¶ 2, Ex A to Pl.'s Mot.)  Like the more familiar film-industry system for rating movies, ESRB ratings apply a range of criteria and assign a letter-rating to indicate game content that may be inappropriate for particular age groups or audiences.  The ESRB assigns the rating "Mature" to games it deems unsuitable for players under 17 years of age; it assigns the rating "Adult Only" to

games with content deemed suitable only for players over 18. (*Id.* at ¶ 6.) Mature games may contain "depictions of violence, blood and gore, sexual content, mature themes, use of a controlled substance and/or strong language." (*Id.* at ¶ 9.) Adult Only games may contain more "prolonged scenes of intense violence and/or graphic sexual content and nudity." (*Id.*) According to Patricia Vance, President of the ESRB, the rating system is intended as a guideline for consumers, especially parents; it is not designed to facilitate governmental regulation of the video game industry. ( *Id.* at ¶ ¶ 3, 10.) The ESRB's advertising guidelines also contain self-enforced rules against depictions of "graphic and/or excessive" violence or sexuality in game advertisements. (*Id.* at ¶ 13-15.)

## IV.    Procedural history

In July 2009, on behalf on its member companies, Plaintiff ESA filed suit against the CTA, claiming that the CTA's ban on advertisements for mature and adult video games was facially unconstitutional. In August 2009, the ESA moved for a preliminary injunction, asking this court to enjoin the CTA from enforcing its ordinance pending a trial on the merits.[4] The parties have briefed the issue at length, and each side presented oral argument on the matter on December 11, 2009. For the reasons stated below, Plaintiff's motion for a preliminary injunction is granted.

## DISCUSSION

## I.    The preliminary injunction standard

A preliminary injunction is intended to prevent irreparable injury so as to preserve the court's ability to render a meaningful judgment on the merits. To win a preliminary injunction a party must show that it has a reasonable likelihood of success on the merits, lacks an adequate remedy at law, and will suffer irreparable harm. *River of Life Kingdom Ministries v. Village of Hazel Crest*, 585 F.3d

---

[4]    Though both parties suggest that the facts of this case are essentially undisputed, neither party sought to combine the preliminary injunction hearing with the trial on the merits. As it is unclear how much the factual record would need to be developed prior to a final determination on the merits, the court limits its consideration here to Plaintiff's motion for a preliminary injunction.

364, 369 (7th Cir. 2009). The court must then balance, on a sliding scale, the irreparable harm the moving party will experience without the injunction against the harm the injunction would cause the opposing party. *Id.* The greater the likelihood of success, the less harm the moving party is required to show. *Id.* The court also considers whether the public interest "will be harmed sufficiently that the injunction should be denied." *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

In First Amendment cases, irreparable injury is typically presumed. *Nuxoll ex rel. Nuxoll v. Indian Prairie School Dist. #204*, 523 F.3d 668, 669-70 (7th Cir. 2008)(quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") Money damages are not adequate compensation for the depravation of First Amendment freedoms. *Christian Legal Society*, 453 F.3d at 859. Thus, whether Plaintiff has satisfied the burden necessary to obtain a preliminary injunction in this case turns on whether it has shown a likelihood of success on the merits.

For the reasons explained below, the court believes it has. Specifically, Plaintiff is likely to succeed in establishing that the CTA advertising system retains its character as a public forum for expression and that the CTA's ordinance will not survive strict scrutiny. The court also finds that Plaintiff is likely to prevail, even under the intermediate standards applied to restrictions on commercial speech, and that the balance of equities and the public interest favors the issuance of a preliminary injunction.

## II.     Plaintiff is likely to succeed on the merits

The First Amendment to the Constitution protects freedom of expression against state infringement. The amendment "envisions the citizen shaping the government, not the reverse; it removes 'governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity.'" *Denver Area*

*Educational Telecommunications Consortium, Inc. v. Federal Communications Commission*, 518 U.S. 727, 783 (1996)(Kennedy, J. concurring in part and dissenting in part)(quoting *Cohen v. California*, 403 U.S. 15, 24 (1971). In short, the First Amendment prevents the government from suppressing expression that it "dislikes or otherwise wishes to exclude on account of its effects." *Id.* at 803.

Seventh Circuit authority suggests that video games themselves constitute constitutionally protected speech. In *American Amusement Machine Ass'n v. Kendrick*, the Seventh Circuit emphasized the "literary character" of video games in granting arcade owners a preliminary injunction against a city ordinance that sought to limit the access of minors to violent games. 244 F.3d 572, 579-80 (7th Cir. 2001). Likewise, applying strict scrutiny, the Seventh Circuit struck down Illinois' statewide restriction on the sale of mature and adult video games to minors. *Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641, 646-49 (7th Cir. 2006). In that case, the state had enacted a law that criminalized the sale or rental of sexually explicit video games to minors. Observing that "children have First Amendment rights," the court found the law not narrowly tailored and unconstitutionally overbroad. *Id.* Though those cases address limits on games themselves, rather than on ads, they nevertheless suggest that the advertisements the CTA wishes to ban promote expression that has constitutional value and implicates core First Amendment concerns.

## A.     Plaintiff will likely prevail in showing that the CTA is a public forum

As a general rule, the government may limit or restrict speech that takes place on its own property without violating the Constitution's commands. *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 390 (1993); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). Especially "[w]here the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject."

*International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)(citing *United States v. Kokinda*, 497 U.S. 720, 725 (1990)).

The rights of a potential speaker and the authority of the government to limit expression depend, however, on the type of property that the speaker seeks to access for expressive purposes. *Air Line Pilots Ass'n v. Department of Aviation of the City of Chicago*, 45 F.3d 1144, 1151 (7th Cir. 1995). The First Amendment recognizes three classes of governmental property: (1) the traditional public forum, (2) the designated public forum, and (3) the non-public forum.[5] *Perry Educ. Ass'n,* 460 U.S. at 45-46. "If the property is a public forum, either traditionally or by designation, the government bears a heavy burden in justifying restrictions on speech therein . . ." *Planned Parenthood Association*, 767 F.2d at 1232. Once a public forum is opened up to expression by some groups, the government may not prohibit the expression of others on the basis of what they intend to say. *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone. *Id*. Thus, any content-based prohibition in either a traditional or designated public forum is subject to strict constitutional scrutiny; that is, it must be narrowly drawn to effectuate a compelling state interest. *Perry Educ. Ass'n*, 460 U.S. at 46; *Widmar v. Vincent*, 454 U.S. 263, 269-70 (1981). In contrast, a regulation on speech in a non-public forum need only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46.

---

[5] Traditional public fora are those areas like streets and parks, which are held in trust for use by the public and which "time out of mind" have been used for expressive purposes. *Perry Educ. Ass'n,* 460 U.S. at 45-46 ; *Carey v. Brown*, 447 U.S. 455, 461 (1980). A designated public forum is property which the state has voluntarily opened for use by the public as a place for expressive activity. *Perry Educ. Ass'n,* 460 U.S. at 45-46. All government-owned property that is neither a traditional nor designated public forum falls into the third category, in which the government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *United States Postal Service v. Greenburgh Civic Ass'n*, 453 U.S. 114, 129 (1981); *Jacobsen v. Illinois Dept. of Transportation*, 419 F.3d 642, 647 (7th Cir. 2005).

Before applying public forum doctrine principles, a court must identify the relevant forum to which a speaker seeks access. *Air Line Pilots Ass'n*, 45 F.3d at 1151. Here, the parties agree that the forum impacted by the challenged ordinance includes advertising space in and on CTA buses, trains, and stations.[6] In selling space for advertisements, the CTA seeks to generate revenue by opening its property to an inherently expressive function. Advertisements are a form of speech and truthful ads are generally entitled to the protection of the First Amendment. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)

The Supreme Court has made clear that advertising space on a city's public transportation system is not a traditional public forum. *See Lehman v. Shaker Heights*, 418 U.S. 298, 302 (1974)(a streetcar with a "captive audience" is not a "traditional setting[] where First Amendment values inalterably prevail."); *see also Uptown Pawn & Jewelry, Inc. v. City of Hollywood*, 337 F.3d 1275, 1279 (11th Cir. 2003)(displays on bus-stop benches used to generate advertising revenue were not a public forum); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 976 (9th Cir. 1998)(a city that permitted commercial advertising on its buses but "consistently restricted political

---

[6]     Advertising space must be distinguished from CTA property more generally. CTA property generally is intended to facilitate mass transit in the City of Chicago. In and of itself, it has no expressive purpose. The advertising space on the CTA, on the other hand, is intended both to generate additional revenue and to facilitate a form of private expression. The CTA has a stated preference for commercial speech in its guidelines, and commercial advertisements that conform with the CTA's minimal requirements "shall be accepted" for display. Absent the ban in question, commercial advertisements for video games unquestionably would be compatible with the CTA advertising system's revenue-generating and expressive purposes and requirements.

As other courts and commentators have observed, the public forum analysis is often an ill-suited tool for situations in which the government is attempting to engage in a commercial enterprise to earn revenue through advertising. *See Ridley v. Massachusetts Bay Transit Authority*, 390 F.3d 65, 75-76 (1st Cir. 2004) *quoting* Lawrence Tribe, AMERICAN CONSTITUTIONAL LAW, § 12-24, at 992 (2d ed. 1988)("[W]hether or not a given place is deemed a 'public forum' is ordinarily less significant than the nature of the speech restriction-despite the Court's rhetoric."); Frederick Schauer, *Principle, Institutions, and the First Amendment*, 112 HARV.L.REV. 85, 87 (1998)("Of all of the paths down which the Court might go in dealing with the government enterprise cases, the so-called 'forum doctrine' appears least satisfactory.") Nevertheless, the public forum doctrine remains the governing law in this area and the court endeavors to be faithful to its method of analysis.

and religious advertising" was not operating a public forum.) It is also well settled that a government does not turn a public transportation system into a designated public forum simply by permitting limited discourse there. Instead, to open a nontraditional forum to public discourse, the government must have an affirmative intent to create a designated public forum. *Cornelius*, 473 U.S. at 802. To discern the government's intent, the court must look at the government's policy and practice and examine the nature of the property and its compatibility with expressive activity. *Id.* Courts will infer an intent to designate property as a public forum where the government makes the property generally available to a class of speakers or grants permission as a matter of course. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 350 (6th Cir. 1998)(citing *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678-79 (1998); *Perry Educ. Ass'n*, 460 U.S. at 47.

As already stated, the legal status of the CTA advertising system is not a matter of first impression in this Circuit. In *Planned Parenthood*, the Seventh Circuit expressly held that the CTA advertising system was a designated public forum. 767 F.2d at 1231. Finding that the CTA had no consistently enforced standards for accepting ads, the Court of Appeals stated "[a]ccess to CTA's advertising system . . . is virtually guaranteed to anyone willing to pay the fee. In accordance with this laissez-faire policy, CTA has allowed its advertising space to be used for a wide variety of commercial, public-service, public-issue, and political ads." *Id.* at 1232.

Thought it admits *Planned Parenthood* remains "good law," Defendant urges this court to view that decision as obsolete in light of the CTA's more recent adoption of advertising guidelines and policies. To be sure, the government is not required to retain the open character of a designated public forum indefinitely. *Perry Educ. Ass'n*, 460 U.S. at 46. "However, it cannot be true that if the government excludes any category of speech from a forum through a rule or standard, the forum becomes ipso facto a non-public forum . . ." *New York Magazine v. Metropolitan Transportation Authority*, 136 F.3d 123, 129-30 (2nd Cir. 1998). Such a rule "would allow every

designated public forum to be converted into a non-public forum the moment the government did what is supposed to be impermissible in a designated public forum, which is to exclude speech based on content." *Id.* at 130.

In the court's view, the CTA has not done enough to demonstrate an intent to alter the public character of its advertising system. Based on its review of the CTA's existing advertising ordinances, the is unable to conclude that the CTA has adopted "a policy of selective access for individual speakers rather than allowing general access for an entire class of speakers." *United Food & Commercial Workers Union,* 163 F.3d at 350 (citing *Arkansas Educ. Television Comm'n*, 523 U.S. at 679 (1998)); *see also DeBoer v. Village of Oak Park*, 267 F.3d 558, 566 (7th Cir. 2001)("[T]he more selective the government is in restricting access to its property, the more likely that the property will be considered a nonpublic forum."). Accordingly, the CTA's efforts since *Planned Parenthood* appear to fall well short of what would have been necessary to resurrect the system's non-public-forum status.[7]

Ordinance 91-169, which Defendant points to as evidence of its intent, states that the CTA's purpose in adopting the advertising guidelines was to "create certain exceptions to the non-public forum status of CTA property." As the court understands the argument, Defendant suggests that by formally making "exceptions to [its] non-public forum status," the CTA was effectively announcing that its buses and trains are non-public. The language of the provision, however, does not evince an unambiguous governmental intent to selectively restrict access and thereby alter the open character of the CTA advertising system. At best, the provision seems to indicate an intent to confine expression to the limited public forum of the CTA advertising system, but to keep that forum

---

[7]     There is little in the record at this stage in the litigation to show whether or how the CTA actually enforces its ordinances, or whether CTA practice somehow asserts greater proprietary control over its advertising system. Defendant essentially rests on the assertion that the ordinances establish on their face that the CTA is not a public forum. In light of *Planned Parenthood's* holding to the contrary, the court cannot accept Defendant's contention absent a stronger showing.

open to an entire class of "public-service, commercial and other advertising."[8]  *See Christ's Bride*

*Ministries, Inc. v. Southeastern Pennsylvania Transportation Authority*, 148 F. 3d 242, (3rd Cir.

1998)("Restrictions on the use of the forum, however, do not necessarily mean that [the

government] has not created a public forum.  They may demonstrate instead that [the government]

intended to create a limited public forum, open only to certain kinds of expression.").

The guidelines established by the ordinance themselves tend to corroborate the conclusion

that the CTA intended for its advertising system to retain designated public forum status for

advertisers.  The ordinance instructs that the CTA *shall* accept all advertisements that do not violate

the minimal restrictions set forth in the guidelines–restrictions that primarily prohibit only that speech

that is not entitled to First Amendment protection in the first place.  For example, the rules prohibit

untrue commercial advertising, solicitation of illegal acts, obscenity, and incitement—all categories

that are wholly or partially outside the ambit of the Constitution's protections.  The accompanying

prohibitions of graphic sexuality, horrific depictions of violence and dismemberment,[9] and the ban

_____

[8]        The Seventh Circuit has recently expressed some doubt on the utility of the term "limited public forum," and indeed some doubt on the utility of the forum analysis generally.  *Illinois Dunesland Preservation Society v. Illinois Dept. of Natural Resources*, 584 F.3d 719, 723-24 (7th Cir. 2009)("It is difficult to see what difference there is between [restrictions in a limited public forum] and the selection that the director of a state theater has to make among theater groups clamoring for access to the stage.  Indeed it is rather difficult to see what work 'forum analysis' in general does. It is obvious both that every public site of private expression has to be regulated to some extent and that the character of permitted regulation will vary with the differences among the different types of site. . . . The constant . . . is that regulation is not to be used as a weapon to stifle speech.").  This court uses the term "limited public forum" as the Court of Appeals did to "denote a public facility . . . reserved for some types or classes of speaker."  *Id* at 723.  The court also notes that a limited public forum is the functional equivalent of a designated public forum for the reserved class of speakers.  *Id.*

[9]        The depictions of violence suggested by the ordinance might also be classified as unprotected obscenity, as they share the hallmark of sexual obscenity: offensiveness.  "Maybe violent photographs of a person being drawn and quartered could be suppressed as disgusting, embarrassing, degrading, or disturbing without proof that they were likely to cause any of the viewers to commit a violent act.  They might even be described as 'obscene,' in the same way that photographs of people defecating might be, and in many obscenity statutes are, included in the

(continued...)

13

of advertisements that undermine the safety of the traveling public can presumably be justified by concern for the safety and sensibilities of the CTA's captive passenger audience. Those regulations would likely be upheld even under the strict scrutiny analysis implicated when evaluating regulation of a public forum, and they do not indicate an intent to limit access to the forum. Likewise, the alcohol and tobacco ad bans do not indicate an intent to alter the open character of the forum. Such ads promote products and activities that cannot be legally engaged in by a sizeable portion of CTA's ridership, and the CTA likely could defend those bans under strict scrutiny. That is not the case with mature-rated video games, which are legal for all purchasers and for which the CTA has made no showing supporting its contention that private use has serious deleterious consequences for the riding public. Taken as a whole, the guidelines and alcohol/tobacco bans represent only minimal limits around the edges of what otherwise remains an entirely permissive forum for public discourse. *See Christ's Bride Ministries*, 148 F.3d at 252 (transit system's adoption of written guidelines that excluded "only a very narrow category of ads" and "practice of permitting virtually unlimited access to the forum" created a designated public forum). The CTA's guidelines do not evince a governmental intent to act as a proprietor by selectively restricting access to the advertising system to all but a few approved speakers.

Rather, the CTA appears to be largely continuing its policy of opening its advertising space to any member of the public that can pay the advertising fee. It appears undisputed that the CTA continues to accept the vast majority, if not all, of the advertisements that are submitted to it for display. *Cf. Christ's Bride Ministries*, 148 F.3d at 242 (finding that acceptance of "99% of all ads . . . without objection" was sufficient to create a public forum). The CTA has no ban on political speech on its advertising system. *Cf. New York Magazine*, 136 F.3d at 130 (finding that

[9](...continued)
legal category of the obscene. . ." *American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572, 575 (7th Cir. 2001).

acceptance of political advertising was sufficient to create a public forum). A wide variety of potentially controversial commercial, public-service, public-issue, and political ads continue to appear on the system. *Cf. Planned Parenthood*, 767 F.2d at 1231 (finding that a wide variety of ads was indicative of public forum). As Plaintiff's exhibits illustrate, the CTA has accepted advertisements for everything from an atheism advocacy group's campaign against organized religion to an experimental theater's promotion for something called "Puppetry of the Penis." (Ex. C. to Pl's Mem.) Notably, on those occasions when the CTA has drawn public criticism for the advertisements that it displays, its own representatives have defended its actions by invoking the public forum doctrine. According to a 1994 newspaper report produced by Plaintiff, three years after the Chicago Transit Board adopted the advertising guidelines, then-CTA President Robert Belcaster responded to complaints about a sexually-suggestive ad campaign by telling the press that "the CTA is a public forum and cannot censor advertising." (Pl.'s Rep. at 3.) This admission by a senior officer speaks clearly about how the CTA itself apparently understood and enforced its own regulations.

Based on the limited record before the court at this early stage of litigation, the CTA advertising system likely remains a designated public forum, as it was when *Planned Parenthood* was decided. Defendant has not demonstrated that it endeavored to alter the character of the forum by selectively allowing access only to a limited group of speakers. Instead, the court finds it more likely that advertisements for mature video games were singled out from an otherwise inclusive forum because they promote a product that the CTA "dislikes or otherwise wishes to exclude on account of its effects." Accordingly, the court finds that Plaintiff is likely to prevail in establishing that the CTA is a public forum for expression.

**B.      Plaintiff will likely prevail in showing that the ordinance fails strict scrutiny**

Because a principal purpose of public fora is the free exchange of ideas, the absolute prohibition on a particular type of expression will be upheld only if it is necessary to serve a

15

compelling state interest and is narrowly drawn to achieve that interest.  *Jacobsen v. Illinois Dept. of Transportation*, 419 F.3d 642, 646 (citing *Cornelius*, 473 U.S. at 800).  The court finds that Plaintiff will likely succeed in showing that the challenged CTA ordinance (Ordinance 008-147) does not survive strict constitutional scrutiny.

Ordinance 008-147 bans any advertisement on CTA property which "markets or identifies" a video or computer game with an ESRB rating of mature or adult only.  The ordinance states that it is intended to protect the CTA's "substantial interest in ensuring that [public property is] not used to advertise violent video or computer games which may encourage violent or aggressive behavior." (Ordinance 008-147, Ex. C to O'Keefe Decl.)  The CTA posits that its particular concern is that the juveniles who regularly ride its buses and trains may purchase and play the mature or adult video games advertised on its system and may, as a result, become more violent individuals.[10]

The CTA's claimed concern for the welfare of its young riders may be a legitimate state interest, but the ordinance it relies on to achieve that interest is overbroad, ineffectual, and not narrowly tailored.  An interest in protecting young or sensitive passengers might have potentially justified a hypothetical restriction on all depictions or suggestions of violence in advertisements displayed on the CTA system.  Such violent displays would be unavoidable by young or sensitive passengers and the CTA might have an interest in protecting its riders from ads that will be offensive to them.  *See Lehman,* 418 F.3d at 302 ("The streetcar audience is a captive audience. It is there as a matter of necessity, not choice."); *Interstate Circuit Inc. v. City of Dallas*, 390 U.S. 676, 690 (1968)(the government has a "strong and abiding interest" in the welfare of its youth, and it may regulate the dissemination of materials that may be objectionable to juveniles in ways that

---

[10]     It is also a reasonable inference that another motivating impetus of the ordinance was the CTA's desire to forestall the popular criticism it had received for displaying ads for the controversial mature-rated video game *Grand Theft Auto IV.*  The desire to avoid public criticism or to suppress public controversy is, of course, not a compelling state interest that justifies restrictions on expression.

it clearly could not for adults). The ordinance challenged here, however, works without regard to what the ads actually show or contain or whether their content would be offensive or innocuous to CTA riders. Instead, the ordinance bans any advertisement that "markets or identifies" mature or adult video games, regardless of any other content in or the appearance of the ad itself. On its face, the ordinance would prohibit an ad with just the bare text: *"Grand Theft Auto IV* is now for sale. It contains content that is inappropriate for anyone below 17 years of age." The ordinance would even seemingly prohibit an ad that read: "Tell the state legislature not to regulate games like *Grand Theft Auto IV*."

To defend this blanket ban, the CTA invokes an interest in preventing a subsidiary harm: the real violence that is arguably encouraged by the simulated violence of video games. When the state seeks to defend a speech regulation based on some attenuated harmful consequence of the speech, it must generally present a "compelling basis for believing" that these harms actually exist and are not a mere pretext for impermissible regulation. *American Amusement Machine Ass'n*, 244 F.3d at 576. The CTA has not demonstrated any likelihood that it will be able to establish a compelling basis to support its averred connection between advertisements for mature-rated games, the violence those games may contain, and the prevalence of violence among the CTA's young passengers. In *American Amusement Machine*, the Seventh Circuit observed that violent video games contain "age-old themes of literature" and concluded that any asserted harm posed by such games was "implausible, [and] at best wildly speculative." *Id.* at 579; *See also Entertainment Software Association v. Blagojevich,* 404 F.Supp. 2d. 1051 (N.D. Ill. 2005)("Defendants have failed to present substantial evidence showing that playing violent video games causes minors to have aggressive feelings or engage in aggressive behavior."), *aff'd* 469 F.3d 641 (7th Cir. 2006). As far as the court is aware, the CTA possesses no new research or evidence that would contradict the prior findings of courts in this Circuit that there is insufficient evidence connecting real violence with violent games to justify restrictions on expression.

17

There also seems to be an imperfect fit between the CTA's stated interest in restricting expression that indirectly encourages violence and the actual impact of Ordinance 008-147. In one sense, the ordinance is too broad, and in another it is too narrow. It is too broad because, according to the ESRB, video games may be rated "mature" or "adult only" for a variety of reasons. For instance, a mature-rated video game may earn its rating for containing "mature themes" or "strong language" even if it contains no violence at all. The CTA does not dispute that, though many mature-rated video games contain violence, some at least do not. The CTA's reliance on the ESRB rating system as the measure of what may be advertised, then, appears to sweep too broadly for the CTA's stated interest. Because it captures at least some advertisements for games that have no violent content at all, the ordinance is overbroad and not narrowly tailored.

The ordinance also appears to be too narrow to effectuate the CTA's stated purpose. Video games consist of a tiny fraction of the media violence to which children are exposed. *American Amusement Machine Ass'n,* 244 F.3d at 579. Yet the CTA's ordinance singles out only video game advertisements for regulation, while granting carte blanche to a wide range of advertisements for other forms of media that may depict similar violence and may be similarly rated for age appropriateness. If an advertiser sought to place identical advertisements for an R-rated film and an M-rated video game of the same name—both with the same characters, based on the same story line, and containing the same depictions of violence—the ad for the video game would be banned while the ad for the film would be displayed. This would remain true even if the film is excessively violent and the game not violent at all. It would also remain true if the ad for the film itself depicts acts of violence, such as the use of firearms, and the ad for the game contains only the text of its title. The CTA offers no defensible distinction that supports the singling out advertisements for some forms of violent expression but not others. Even if it could, the Seventh Circuit has shown resistance to recognizing any such proffered distinction in the past:

To shield children right up to the age of 18 from exposure to violent descriptions and

> images would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it. Maybe video games are different. They are, after all, interactive. But this point is superficial, in fact erroneous. All literature (here broadly defined to include movies, television, and other photographic media, and popular as well as highbrow literature) is interactive; the better it is, the more interactive. Literature when it is successful draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own. . . . Most video games . . . are stories. . . . [Some have] a message, even an "ideology," just as books and movies do.

*American Amusement Machine Ass'n*, 244 F.3d at 577. Because the ordinance at issue here fails to regulate advertisements for comparable forms of violent media, even those that might be substantially more violent, offensive, or upsetting to young or sensitive passengers than video games, the court concludes that it does not materially advance the government's stated goal in a narrowly tailored way. *See Entertainment Software Association v. Granholm*, 426 F.Supp.2d 646, 654 (E.D. Mich. 2006)(a statute regulating the purchase of violent video games but not comparable forms of violent media by minors fails strict scrutiny).

Given that the CTA's ordinance is unlikely to survive strict scrutiny, Plaintiff has established a substantial likelihood of success on the merits.

### C. Plaintiff is likely to succeed even under a commercial speech analysis

Although the court has devoted substantial attention to the public forum analysis, principles regulating commercial speech may also be implicated here. Video game advertisements are commercial speech because, by attempting to induce people to purchase a product, they "propose a commercial transaction," the test under *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976). As such, like all truthful commercial speech that is not misleading, a video game advertisement enjoys a "limited measure of protection commensurate with its subordinate position in the scale of First Amendment values." *Ohralik,* 436 U.S. at 456. Commercial speech, while protected, is generally subject to modes of regulation that might be impermissible in the realm of noncommercial expression. *Id.* Significantly, however, once the

existence of a public forum for expression has been found, courts generally make no distinction between commercial and non-commercial speech. The many cases that address commercial advertisements on public property have all approached the issue from a forum-analysis perspective.

Even were the court to engage in the intermediate constitutional scrutiny that applies to governmental restrictions on commercial speech, the CTA's video game advertisement ban would likely still fail. Under *Central Hudson*, restrictions on commercial speech may be no more expansive than necessary to serve a substantial government interest. *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980); *Board of Trustees v. Fox*, 492 U.S. 469, 476 (1989). As explained earlier, there is no "fit" between the governmental interest and the means adopted in this case. *Id.* at 480. The ordinance is both too broad and too narrow, as it bans advertisements for games that may contain no violence but permits advertisements for other forms of media that may be excessively violent. Even in cases involving commercial speech, decisions that select among speakers conveying virtually identical messages conflict with the principles undergirding the First Amendment. *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 194 (1999). Accordingly, Plaintiff has shown a likelihood of success on the merits, even assuming that an intermediate standard of scrutiny is all that is called for here.

**III.      The balancing of equities and the public interest favors an injunction**

Plaintiff has demonstrated a strong likelihood of success on the merits and possesses an "unquestionably substantial" interest in exercising its First Amendment freedoms. These factors militate strongly in favor of injunctive relief. *Christian Legal Society,* 453 F.3d at 863. In contrast, Defendant has not shown that it will suffer any harm from the issuance of a preliminary injunction. A preliminary injunction against enforcement of the CTA's ban does no more than compel the CTA, for the duration of the litigation, to accept advertisements in a manner consistent with its practices and policies as they existed prior to January 1, 2009. The only interest that the CTA does posit appears to be an impermissible one: discouraging the promotion, sale, and dissemination of mature

video games—a form of expression of which the CTA disapproves. "While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557, 579 (1995). The balance of equities favors Plaintiff and the issuance of a preliminary injunction.

The public interest is the "wild card" in any preliminary injunction calculation. *Lawson Products, Inc. v. Avnet Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986). Because this case involves a regulation that governs the display of advertising on a public transportation system, the issuance of a preliminary injunction may have an impact on CTA riders and the general public. The court is mindful of Justice Douglas's concurring admonition in *Lehman* that "the right of commuters to be free from forced intrusions on their privacy" is also implicated in such situations. 418 U.S. at 307. But the public also has an undeniable interest in seeing that the First Amendment is enforced to protect free expression. *See Christian Legal Society,* 453 F.3d at 859 ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). The CTA has been operating a public forum for expression for more than 20 years and it has previously displayed advertisements in the very category it now seeks to prohibit without any known grievous injury to the riding public beyond possible annoyance. The public interest is not a barrier to the issuance of a preliminary injunction here.

### CONCLUSION

In an effort to avoid public controversy and to protect its riders from the effects of their own private choices, the CTA singled out for prohibition all advertising references to a solitary class of product—mature and adult video games, which (unlike alcohol and tobacco) are themselves forms of protected speech and which are legal for people of all ages to purchase. While the CTA would likely be entitled to enforce such a ban were it serving solely as the proprietor of its own non-public-

forum property, it cannot do so in a forum that this Circuit has explicitly found to be a designated public forum for free expression. Accordingly, the court finds: (1) Plaintiff has demonstrated a likelihood of success in establishing that the CTA advertising system retains its character as a public forum for expression; (2) Plaintiff has demonstrated a likelihood of success in establishing that the challenged ordinance cannot survive strict scrutiny; (3) Plaintiff will likely prevail, even under the intermediate scrutiny applied to commercial speech; and (4) Balancing the equities and the public interest favors the issuance of a preliminary injunction.

Plaintiff's motion [22] is granted. The court enjoins enforcement of the Ordinance 008-147 pending trial on the merits.

ENTER:

Dated: January 7, 2010

_____
REBECCA R. PALLMEYER
United States District Judge